J-A30035-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: THE ESTATE OF: JOHN SAMUEL FITZ, DECEASED | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: SANDRA HOFFMAN | : : : : : : : : | |
| | : | No. 337 MDA 2019 |

Appeal from the Order Entered January 22, 2019
In the Court of Common Pleas of York County Orphans' Court at No(s):
6715-1697

BEFORE:   DUBOW, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                **FILED JANUARY 14, 2020**

Appellant, Sandra Hoffman, appeals from the order of the orphans' court denying Appellant's petition for declaratory relief that she and John Samuel Fitz, the Decedent, had entered into a valid common law marriage in September 2003.  We affirm.

Appellant and Decedent began dating in 2001, and in 2002, Appellant moved in with Decedent at Decedent's house in York, Pennsylvania.  Decedent died intestate on September 17, 2015, and on September 30, 2015, letters of administration were granted to John C. Fitz, Decedent's son.

Appellant filed the declaratory judgment petition on February 12, 2016. In the petition, Appellant asserts that during Labor Day celebrations in

---

[*] Retired Senior Judge assigned to the Superior Court.

September 2003[1] she and Decedent announced to Appellant's son and his partner that they were "cohabitating and committed to each other as Husband and Wife." Petition ¶5. Appellant alleged that they upheld their marital obligations to each other until Decedent's death, including by living and socializing together, sharing bank accounts, and providing care for each other. Petition ¶¶7-13. Decedent's son, the administrator of Decedent's estate, filed an answer to the petition stating that the estate did not oppose the petition.

A hearing was held on the petition on September 27, 2016. At the hearing, an attorney for the Department of Revenue (Department) appeared, but he explained that he had only been retained the day prior to the hearing; the parties therefore agreed that Appellant would take direct examination of the witnesses who were present, but that cross-examination would be reserved for a future hearing after the exchange of discovery. N.T., 9/27/16, at 3-4, 31.

At the hearing, Appellant testified that she and Decedent met in 2001, began cohabitating in 2002, and they declared their intention to enter into a marital agreement during the Labor Day holiday in September 2003. *Id.* at 6-8. Appellant provide the following testimony concerning her and Decedent's 2003 declaration of marriage during direct examination by her counsel:

---

[1] Appellant stated in the petition that the announcement of the agreement to marry occurred in September 2002, but she clarified at the orphans' court hearing that it was in fact during the Labor Day holiday weekend of 2003. Petition ¶5; N.T., 9/27/16, at 6.

Q. Well, . . . [Paragraph] Number 5 [of the petition for declaratory judgment] indicates that on September, 2nd, 2002, during Labor Day celebrations, [Decedent]--

A. Yes.

Q. --and . . . you, announced to [Appellant's] son and significant other partner that they were cohabitating and committed to each other as husband and wife. Is that statement true as an exception?

A. It is true except the date was 2003, not 2002.

. . .

Q. And [in] September 2003, as we said earlier, you made a declaration to all present, concerning the marriage that you had contracted with [Decedent]?

A. Yes, we did.

Q. And he was present?

A. Yes, he was.

Q. He made that declaration with you?

A. Yes, he was.

Q. And can you indicate who was present during that period of time?

A. At that time --

Q. Or at that time, I'm sorry.

A. At that time my son Chad was present and his girlfriend at that time, Jessica Smith.

Q. Was there any [others] present?

A. No.

*Id.*

Appellant further testified that after she moved in with Decedent in 2002, she sold her home, and she and Decedent opened a joint home equity

- 3 -

line of credit and borrowed money to remodel his home. *Id.* at 9-11. Appellant and Decedent also purchased a time share together in Virginia in 2008. *Id.* at 10. After Appellant ultimately retired in 2013, she and Decedent largely lived off his pension, and Decedent informed her that she would be listed as his beneficiary on his retirement benefits. *Id.* at 12-13. Appellant stated that, when Decedent's health began to fail in 2015 and he was admitted to University of Maryland Medical Center, they discussed the steps to formally marry with a social worker; however, by the time her son was able to obtain the information necessary to complete the application for the marriage license, Decedent's health had deteriorated to the point where he could not sign the application. *Id.* at 14-15.

Chad Hoffman, Appellant's son, testified at the hearing that he was present during the Labor Day celebrations in 2003 when Appellant and Decedent declared their intent to marry each other.[2] *Id.* at 19. Hoffman also stated that in 2015 when Decedent was ill, he assisted in Appellant and Decedent's unsuccessful attempt to obtain a marriage license. *Id.* at 20. In

_____

[2] Appellant provided the following testimony regarding the formation of the marital relationship:

Q. Your mother had indicated that you had been present in--during Labor Day of 2003?

A. Yeah.

Q. And that you were present for their declaration concerning their marriage and their living together as man and wife?

A. Yes, I was.

N.T., 9/27/16, at 19.

addition, several friends and neighbors of Decedent and Appellant testified at the hearing regarding the couple's behavior as husband and wife and their reputation in the community as a married couple. *Id.* at 21-30.

Following the hearing, the Department filed an answer to the petition denying that Appellant and Decedent had entered into a common law marriage and requesting that the orphans' court deny the petition for declaratory judgment. Appellant and the Department then engaged in discovery concerning the petition and entered into settlement negotiations. At an August 20, 2018 status conference, Appellant and the Department presented the orphans' court a settlement agreement that was contingent on the orphans' court entering an order declaring that Appellant and Decedent had entered into a common law marriage. Stipulation of Settlement, 8/14/18, ¶6. After the status conference, the orphans' court entered an order stating that it was prepared to approve the settlement but could not rule on the petition based on the incomplete record set forth at the hearing; therefore, the court directed the parties to advise the court whether they wished to resume the hearing or permit the court to rule on the current state of the record. Order, 8/22/18. Pursuant to that order, counsel for Appellant and the Department each advised the orphans' court to rule on the petition for declaratory judgment based on the current state of the record.

On January 22, 2019, the orphans' court entered an order denying the petition. In the order, the orphans' court concluded that, based on the evidence presented at the hearing, which the court determined to be credible,

Appellant had not met the "heavy" burden of establishing that she and Decedent married during Labor Day weekend in 2003. Order, 1/22/19, ¶34. The orphans' court found "compelling" Appellant's testimony that she and Decedent unsuccessfully attempted to obtain a marriage license in the days prior to Decedent's death, stating that it did not believe Appellant and Decedent would have attempted to marry if they had already been married. *Id.* ¶¶32-33. The orphans' court found notable that Appellant had not called as a witness, Jessica Smith, Appellant's girlfriend who had also been present at the Labor Day 2003 celebration, and did not offer an explanation for her reasons for not calling Smith. *Id.* ¶¶25, 31. Finally, regarding Appellant's and Decedent's reputation as a married couple, the orphans' court stated that the descriptions of their relationship by their friends and neighbors applied to any couple who had lived together for a long time in a romantic relationship, but they do not indicate that the couple has taken the final, permanent step of legally marrying. *Id.* ¶30. Appellant filed a timely appeal of this order.[3]

Appellant presents one issue for our review: "Whether based on the evidence a Decree of Common Law Marriage should issue." Appellant's Brief at 4. Our standard of review in a declaratory judgment action is

> limited to determining whether the trial court clearly abused its discretion or committed an error of law. If the trial court's determination is supported by the record, we may not substitute

---

[3] Appellant filed her statement of errors complained of on appeal on March 11, 2019, and the orphans' court entered its opinion on March 12, 2019.

- 6 -

our own judgment for that of the trial court. The application of the law, however, is always subject to our review.

*In re Estate of Carter*, 159 A.3d 970, 974 (Pa. Super. 2017) (citation omitted).

Historically, two types of marriage were recognized in Pennsylvania: ceremonial and common law. *Staudenmayer v. Staudenmayer*, 714 A.2d 1016, 1019 (Pa. 1998); *Estate of Carter*, 159 A.3d at 974. "A ceremonial marriage is a wedding or marriage performed by a religious or civil authority with the usual or customary ceremony or formalities." *Staudenmayer*, 714 A.2d at 1019. A common law marriage, on the other hand "can only be created by an exchange of words in the present tense, spoken with the specific purpose that the legal relationship of [a marital partnership] is created by that" exchange. *Id.* at 1020. Effective January 24, 2005, the General Assembly amended the Domestic Relations Code to abolish common law marriage, but the legislature provided that common law marriages lawfully entered into on or before January 1, 2005 would continue to be recognized. *See* 23 Pa.C.S. § 1103, as amended by Act of Nov. 23, 2004, P.L. 954, No. 144; *Estate of Carter*, 159 A.3d at 974 & n.1.

"The proper procedure for obtaining legal recognition of a common law marriage is the filing of a declaratory judgment action." *Estate of Carter*, 159 A.3d at 974; *see also* 23 Pa.C.S. § 3306.[4] To prove the existence of a

---

[4] Section 3306 of the Divorce Code provides that:

common law marriage, a party must generally show that the couple came to "express agreement" through words spoken in the present tense – or *verba in praesenti* – "uttered with a view and for the purpose of establishing" the marital relationship. ***Staudenmayer***, 714 A.2d at 1020 (citation omitted). "The requirement of 'words in the present tense' is designed to ensure the existence of a present intent to marry, like the present intent established in a formal wedding ceremony, rather than a plan to marry in the future or a claim to have wed in the past." ***Estate of Carter***, 159 A.3d at 979. "The common law marriage contract does not require any specific form of words, and all that is essential is proof of an agreement to enter into the legal relationship of marriage at the present time." ***Staudenmayer***, 714 A.2d at 1020; ***see also Estate of Carter***, 159 A.3d at 979.

"Even before it was abolished in 2005, common law marriage was generally disfavored in Pennsylvania." ***Estate of Carter***, 159 A.3d at 978. "Because claims for the existence of a marriage in the absence of a certified ceremonial marriage present a 'fruitful source of perjury and fraud,' Pennsylvania courts have long viewed such claims with hostility" that must be

---

When the validity of a marriage is denied or doubted, either or both of the parties to the marriage may bring an action for a declaratory judgment seeking a declaration of the validity or invalidity of the marriage and, upon proof of the validity or invalidity of the marriage, the marriage shall be declared valid or invalid by decree of the court and, unless reversed upon appeal, the declaration shall be conclusive upon all persons concerned.

23 Pa.C.S. § 3306.

reviewed with "great scrutiny." ***Staudenmayer***, 714 A.2d at 1019-20 (citations omitted). The party alleging the common law marriage bears the burden of proof, and our Supreme Court has described this burden as a "heavy" one. ***Id.*** at 1020 (citation omitted); ***see also Estate of Carter***, 159 A.3d at 978. Thus, "where the parties are available to testify regarding *verba in praesenti,* the . . . party claiming a common law marriage [must] produce clear and convincing evidence of the exchange of words in the present tense spoken with the purpose of establishing the . . . marriage contract." ***Staudenmayer***, 714 A.2d at 1021.

On appeal, Appellant contends that her testimony regarding the exchange of words setting forth the couples' intentions to marry during a Labor Day celebration in 2003, along with the confirming testimony of her son, established that Appellant and Decedent entered into a common law marital relationship. Appellant notes that the orphans' court found this testimony credible and that no contrary evidence was submitted by the Department at the hearing. Appellant argues that the orphans' court erred in relying on the fact that Appellant and Decedent attempted to obtain a marriage license while Decedent lay ill in the hospital, stating that this determination is contrary to our decision in ***Estate of Carter***, holding that a couple planning a future formal wedding ceremony was "fully consistent with an existing common law marriage." 159 A.3d at 982.

Upon a thorough review of the record, we are not persuaded that the orphans' court abused its discretion in finding that Appellant had not met her

burden of proving by clear and convincing evidence that she and Decedent had formed a common law marriage prior to January 1, 2005. At the orphans' court hearing, Appellant did not provide any description of the words that she said to Decedent or that Decedent said to her that established the couple's present intent to marry. Instead, Appellant simply provided one word affirmative responses to her counsel's recitation of the pleadings in the declaratory judgment petition. Similarly, Appellant's son did not describe the words that either Appellant or Decedent used to establish their marital bond but simply indicated that he was present when these words were exchanged. As the orphans' court further explained, Appellant did not produce Jessica Smith, Appellant's son's girlfriend and the only other witness at the 2003 Labor Day celebration, to testify at the hearing, which, as the court stated, "could possibly have corroborated and/or more fully articulated [Appellant's] testimony" regarding the declaration of marriage.[5] Order, 1/22/19, ¶31.

_____

[5] In her reply brief, Appellant argues that the orphans' court improperly found an adverse inference based upon the absence of Smith's testimony, because Smith was equally available as a witness for the Department, which could have requested that the hearing be resumed so that it could call her as a witness, and because Smith's testimony was cumulative of the testimony of other parties. *See Commonwealth v. Miller*, 172 A.3d 632, 645 (Pa. Super. 2017) (fact-finder may draw a "missing witness" adverse inference based on a party's failure to produce a witness for testimony where the potential witness was available to only that party, the witness appears to have knowledge of special information relevant to the proceedings, and the testimony would be non-cumulative). Contrary to this argument, however, the orphans' court did not find that Smith's testimony would have been unfavorable to Appellant but only that Smith's testimony could have filled in the details regarding the alleged declaration of common law marriage that were lacking in Appellant's presentation of the evidence.

While it was not necessary that Appellant and Decedent made a declaration of common law marriage using a specific set of words, **Estate of Carter**, 159 A.3d at 979, the expression of the present intent to marry is an essential aspect of the court's analysis of whether a common law marriage was created. **Staudenmayer**, 714 A.2d at 1020. The orphans' court properly determined in its discretion that the perfunctory testimony regarding the *verba in praesenti* uttered at the 2003 Labor Day celebration did not rise to this level.

Furthermore, the orphans' court did not err in concluding that Appellant and Decedent's unsuccessful 2015 attempt to obtain a marriage license while Decedent lay gravely ill in a Maryland hospital was evidence that the couple had not previously entered into a common law marriage contract in 2003. **Estate of Carter**, which Appellant relies on for this argument, is inapposite. In that case, a same-sex couple exchanged rings and words indicating their intent to marry in 1997 and planned to have a "formal wedding ceremony" and "big party" after Pennsylvania legalized same-sex marriage, but one member of the couple died in 2013 before same-sex marriage became legal in Pennsylvania. 159 A.3d at 973, 981-82. The trial court determined that the couple's expression of a future intention to formally celebrate their marriage vitiated their 1997 common law contract, but this Court disagreed, concluding that the plan for a future formal ceremony was "fully consistent with an existing common law marriage." **Id.** at 982. Unlike **Estate of Carter**, no evidence was presented in this case that Appellant and Decedent had planned a ceremony to celebrate their wedding with friends and family that

they had already established through a common law agreement. *Cf. id.*; *see also In re Belcher's Estate*, 112 A.2d 129, 130-31 (Pa. 1955) (spouse's "statements relative to intention to marry related solely to a *ceremonial* marriage" and therefore did not undermine the common law marriage that had already been formed) (emphasis in original); *Brandywine Paperboard Mills v. Workers' Compensation Appeal Board (Zittle)*, 751 A.2d 1205, 1206, 1208 (Pa. Cmwlth. 2000) (holding that a common law marriage was established even though the parties had made plans to have a "church wedding" prior to the decedent's death). Instead, the evidence establishes that Appellant and Decedent attempted to obtain a marriage license in Maryland in the days prior to Decedent's death, which the orphans' court fairly determined was evidence that they had not previously established a marital relationship.

In addition, Appellant argues that even if the evidence was found lacking as to the formation of a common law marriage in 2003, she was entitled to a rebuttable presumption of common law marriage under our case law based on the evidence of her cohabitation with Decedent from 2002 until Decedent's death in 2015 and the testimony of Appellant and Decedent's friends and family that the couple described themselves and were known as a married couple. As the Department presented no contrary evidence to rebut this presumption, Appellant asserts that this evidence should have conclusively established the existence of the common law marriage.

The rebuttable presumption of a common law marriage may be raised where the proponent of the marriage demonstrates (i) constant cohabitation by the parties and (ii) a reputation of marriage "which is not partial or divided but is broad and general." *Staudenmayer*, 714 A.2d at 1020-21 (citation omitted); *see also Carter*, 159 A.3d at 979. However, this rebuttable presumption is "is one of necessity to be applied only in cases . . . [where there is an] inability to present direct testimony regarding the exchange of *verba in praesenti*." *Staudenmayer*, 714 A.2d at 1021 (citation omitted). The rebuttable presumption is thus most often applied in the context of a claim for a putative surviving spouse's share of an estate where the Dead Man's Act[6] prohibits the surviving party from testifying regarding the exchange of marital vows with the common law spouse. *Id.*; *In re Estate of Stauffer*, 476 A.2d 354, 356-57 (Pa. 1984). On the other hand, however, our Supreme Court has held that

> if a putative spouse who is able to testify and fails to prove, by clear and convincing evidence, the establishment of the marriage contract through the exchange of *verba in praesenti,* then that party has not met its "heavy" burden to prove a common law marriage, since he or she does not enjoy any presumption based on evidence of constant cohabitation and reputation of marriage.

---

[6] 42 Pa.C.S. § 5930. The purpose of the Dead Man's Act is to "to prevent the injustice that might flow from permitting a surviving, adverse party to give testimony that is favorable to himself and unfavorable to the decedent's interest, but which the decedent's representative is in no position to rebut." *Schroeder v. Jaquiss*, 861 A.2d 885, 889 (Pa. 2004).

*Staudenmayer*, 714 A.2d at 1021.[7]

In the instant matter, Appellant, the surviving putative spouse, offered her own testimony and the testimony of her son regarding the formation of a common law marriage with Decedent. Decedent's estate, however, notified the orphans' court that it was not taking a position on whether the orphans' court should rule that Appellant and Decedent had formed a common law marriage. In any event, no objection was made based upon the Dead Man's Act, and therefore the protection of that statute is waived. *See Olson v. North American Industrial Supply, Inc.*, 658 A.2d 358, 364-65 (Pa. Super. 1995). Accordingly, because Appellant was able to offer evidence regarding the exchange of *verba in praesenti* with Decedent, the rebuttable presumption based on cohabitation and reputation does not apply. *Staudenmayer*, 714 A.2d at 1021. As the orphans' court conclusion that Appellant's evidence regarding the exchange of words did not meet her heavy burden did not constitute an abuse of discretion or error of law, Appellant is entitled to no relief on appeal.

Order affirmed.

---

[7] In *Staudenmeyer*, our Supreme Court addressed a situation where both parties to a putative common law marriage were alive and able to testify as to the exchange of *verba in praesenti*. 714 A.2d at 1021. However, as this Court explained in *Estate of Carter*, the holding of *Staudenmeyer* is equally applicable in cases where one party to the purported common law marriage is deceased, but no objection is made based on the Dead Man's Act, and therefore the putative surviving spouse offers testimony regarding the exchange of words. *Estate of Carter*, 159 A.3d at 980 n.9.

- 14 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/14/2020